Argued October 26; affirmed November 23, 1948

# KILKENNY, Administrator, *v.* BEEBE

199 P. (2d) 916

*John F. Kilkenny* argued cause for respondent. On the brief were Raley, Kilkenny & Raley, of Pendleton.

*W. C. Perry* argued the cause for appellant. On the brief were Randall, Perry & Wells, of Pendleton.

Before Rossman, Chief Justice, and lusk, belt, Bailey and Hay, Justices.

ROSSMAN, C. J.

This is an appeal by the defendant from a judgment, based upon a verdict, in favor of the plaintiff, who is the administrator of the estate of Forrest Noel, deceased. Noel died September 15, 1947, as the result of injuries which he received on that day when a car which he was driving overturned a few miles east of Umatilla. The car driven by Noel was attempting to pass a truck operated by an employee of the defendant when, according to the complaint, the truck, without warning, turned to the left and ran into the side of the car. The answer, in addition to denying that the truck altered its direction, denied all averments of negligence. In view of the evidence which we shall shortly review, we deem it pertinent to mention at this point that the defendant denies that the truck ran into or touched the car.

The appellant presents only one assignment of error; it follows:

"The court erred in refusing to give the appellant's requested instruction as follows:

" 'You are instructed that if it affirmatively appears from the said evidence in this case that a contributing cause of the accident was the action of Forrest Noel in failing on overtaking the vehicle of the defendant to pass the same to the left of said vehicle at a safe distance, then your verdict must be against the plaintiff and in favor of the defendant'."

The respondent claims that (1) the requested instruction, if given, would have told the jury that Noel failed to pass the truck at a safe distance; and (2) other instructions sufficiently told the jury that a car overtaking another from the rear must clear it by a safe distance.

Section 115-330, O. C. L. A., says:

"Except as otherwise provided in § 115-331 the following rules shall govern the overtaking and passing of vehicles:

"(a) The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the highway until safely clear of such overtaken vehicle.

"(b)* * *

The mishap which caused the death occurred a few miles east of Umatilla upon a highway known as No. 730. The highway at that place is long and straight. The pavement is 19 feet and 11 inches wide and a yellow stripe marks its center line. At or near the place where the accident occurred a private road, about a half mile long, leads from highway No. 730 north to a warehouse owned by the defendant. The latter is a contractor who is engaged in construction work upon McNary Dam.

About 4:30 p. m., September 15, 1947, three trucks which were being operated by employees of the defendant were traveling east along highway No. 730 and were approaching the place where the aforementioned private road enters the highway. They intended upon reaching that place to turn to the left into the private road. The first truck was about 600 feet ahead of the rear one. The driver of the first truck was James Fisher, of the second was Julian Patterson, and of the third, or rear truck, was James Perkins. The car which Noel was operating was traveling upon the same highway in the same direction as the trucks and was overtaking them. It was a Nash and its owner was Gus Bonander, who was seated alongside Noel. The body of

the truck which Fisher drove was a large tank. The truck lacked a rear-view mirror.

The plaintiff claims that after the deceased had passed two of the trucks and had got alongside the one which Fisher was driving, Fisher, without giving a signal, turned to the left and collided with the Nash. The plaintiff suggests that Fisher intended to turn into the road which leads from the highway to the warehouse. According to the plaintiff, the collision caused the Nash to swerve and then overturn.

The defendant denies that a collision occurred between the Nash and the truck. According to evidence which he presented, the Nash, while passing the truck, got out of control and presently overturned. According to the defendant's evidence, the Nash and the truck did not touch each other. Witnesses for the defendant swore that when the Nash passed Fisher's truck the latter had not reached the place where the private road enters the highway.

In view of the assignment of error, we shall now review the evidence which shows how close to the truck the Nash was when it undertook to pass that vehicle. Before so doing we pause to mention the fact that substantial evidence indicates that the two vehicles came into contact with each other. For instance, the right side of the Nash was badly crushed. It bears deep indentations beginning at the front fender and extending to the rear, which the plaintiff claims correspond in width and character to the six-inch channel iron which constituted the front bumper of the truck. Likewise yellow particles of paint were found upon the right side of the Nash after the accident. They correspond to the yellow paint which covered the truck.

Bonander, as a witness for the plaintiff, testified

that when the Nash undertook to pass Fisher's truck, its (the Nash's) right wheels were "about two feet north of the center line" and the truck was in its proper half of the road (the south half). According to Bonander, the Nash was traveling 40 to 45 miles per hour. When it drew alongside the truck, so Bonander swore, the truck suddenly turned to the left and struck the Nash.

We come now to the testimony which was given by the three truck drivers, Perkins, Patterson and Fisher. They were called to the witness stand by the defendant.

Perkins, the operator of the first of the three trucks which the Nash passed, that is, the rear truck, swore that the Nash was proceeding at 80 to 90 miles per hour. He testified that all three of the trucks were on the south half of the road. We now quote from his testimony:

"Q. When this Nash automobile passed the truck you were operating, did he pass you pretty close or was he out pretty wide on the shoulder?

"A. He swung out pretty wide. He was six feet from me. I would say there was six feet difference.

"Q. When the Nash passed you there was six feet between your truck and the right side of the Nash?

"A. Yes, sir.

"Q. When the Nash car passed you were all four wheels of the car on the highway?

"A. No, sir, the two left wheels were on the shoulder of the pavement.

"Q. That would be the north shoulder?

"A. That would be the north shoulder.

"Q. Did the Nash car maintain that position during all the time it traveled in an easterly direction and passed the two trucks ahead of you?

"A. To the best of my knowledge, yes."

It is clear from his testimony that the Nash was constantly on the north side of the roadway while it was passing the trucks and that they were upon the other half. In fact, according to him, the left wheels of the Nash were upon the shoulder and the right were no nearer than six feet to the left side of the trucks.

Patterson, the driver of the second, or middle, truck, swore that after the Nash had passed his truck it swerved to the center of the road and then back to the left half in order to pass Fisher. According to him, Noel, the driver of the Nash, "was on the shoulder when he passed Fisher." We quote the following also from his examination:

"Q. How many feet when he got even, how many feet were there between the left side of the truck and the right side of the automobile?

"A. From where I could see, there was a good two feet.

"Q. There was a good two feet and then when he changed over after he was actually past, he swerved to the north?

"A. Yes.

"Q. So the distance became greater. Is that right?

"A. That is right.

"Q. Was he at any time close to the front end of the truck?

"A. No, sir.

"Q. He would be how far from the front end of the truck?

"A. I would say he never got no closer than two feet from the front end of the truck.

"Q. The Nash automobile at all times when passing the truck was on the north side of the yellow center line?

"A. That's right.

"Q. You are positive about that?

"A. Yes.

"Q. That the Nash automobile was at all times on the north side of the yellow center line of the highway?

"A. While he was passing the truck. Yes.

"Q. And he was no less than—no closer than two feet to the yellow center line?

"A. He wasn't any closer than two feet to the truck.

"Q. Well now, how far was the truck from the yellow center line?

"A. His left wheel was just about on it.

"Q. The automobile was at all times two feet—the right wheels were north of the yellow center line?

"A. That's right.

"Q. You are positive of that?

"A. Yes."

Fisher testified that as he approached the place where the private road enters the highway, he opened his door and moved himself to such a position that he could look to the rear. When he glanced to the rear he saw, so he swore, the Nash alongside his truck "coming toward me." Although he described the Nash as "coming toward me", no collision occurred—if he told the truth. He described the position of his truck in the following testimony:

"A. I was over on the right hand side possibly about—oh, I would say one foot from the yellow line—maybe a little further than that, because the tank sticks out a ways. I was clear of the yellow center line with my own truck, of course."

In the following additional excerpt taken from his testimony the pronoun "it" refers to the Nash.

"Q. It was on what side of the highway—the north side of the highway?

"A. It was on the left side of the highway.

"Q. It continued on the left side of the highway?

"A. He swerved off the highway right there, but he was on the left hand side, on the north side of my truck.

"Q. At all times he was north of the yellow center line?

"A. I think so. But I am not too sure about that.

"Q. At all times when passing he was north of the yellow center line?

"A. At all times in my vision he was on the north side of the yellow line in the road.

"Q. Did he get out of your vision?

"A. After the first I saw him, I don't think he did. No.

"Q. Where did the automobile go after you first saw it?

"A. The Nash automobile? He came towards me and swerved back to the shoulder of the road.

"Q. That would be north?

"A. That is right. He seemed like he kind of went that way like an "S" slide. When I opened the door he was coming towards me and I jumped in the truck and slammed the door and he went that way."

It is seen from the foregoing that the defendant, in endeavoring to sustain his defense, presented evidence showing that the Nash, when it passed Fisher's truck, went so far to the left side of the roadway that its left wheels got off the pavement and on to the shoulder. The plaintiff, however, does not argue that the requested instruction was inappropriate on account of that fact.

By returning to the requested instruction, which is quoted in a preceding paragraph, it will be seen that it does not say:

"You are instructed that if it affirmatively appears from the evidence in this case that Noel, in passing the truck, failed to clear it at a safe distance and that his failure so to do was a contributing cause of the accident, then * * *."

To the contrary, the requested instruction assumed that Noel failed to allow a sufficient margin of safety between his car and the truck. It dealt with that disputed phase of the case as though the evidence were against the plaintiff; that is, as though Noel were conclusively guilty of the charge made by the defendant. The plaintiff, as we have seen, contended throughout that Noel had not violated the part of § 115-330, O. C. L. A., quoted in a preceding paragraph.

██ Error is not committed when the trial judge refuses a requested instruction which assumes the existence of a material fact disputed by the adversary of the requested instruction, unless the evidence is so conclusive that the assumed fact presents no issue for the jury: *West v. Jaloff,* 113 Or. 184, 232 P. 642; *Salmi v. Columbia & N. R. R. Co.,* 75 Or. 200, 146 P. 819, L. R. A. 1915D 834; *Kemp v. Portland Ry., L. & P. Co.,* 74 Or. 258, 145 P. 274; *West v. McDonald,* 67 Or. 551, 136 P. 650; *Schroeder v. Brown & McCabe,* 59 Or. 81, 116 P. 335; *Owens v. Snell, Heitshu & Woodard Co.,* 29 Or. 483, 44 P. 827. We believe that no error was committed when the trial judge refused to give to the jury the requested instruction.

The judgment of the circuit court is affirmed.